DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, Keith L. Gilcreast, appeals from the judgment of the Summit County Court of Common Pleas which convicted him of murder, attempted murder, felonious assault, improper discharge of a firearm, possessing a weapon while under disability, carrying a concealed weapon, trafficking in marijuana, possession of marijuana, and possession of drug paraphernalia. We affirm in part, reverse in part, and remand
 {¶ 2} On November 14, 2002, the Summit County Grand Jury charged Defendant with one count of murder, with a gun specification, in violation of R.C. 2903.02(B); one count of felonious assault, with a gun specification, in violation of R.C. 2903.11(A)(2); two counts of having weapons while under disability, in violation of R.C. 2923.13; one count of receiving stolen property, in violation of R.C. 2913.51; and one count of trafficking in marijuana, in violation of R.C. 2925.03(A)(2). Thereafter, a supplemental indictment was filed charging Defendant with one count of attempted murder, with a gun specification, in violation of R.C. 2903.02(A) and 2923.02; improper discharge of a firearm with a gun specification, in violation of R.C. 2923.161; three counts of having weapons while under disability, with a gun specification, in violation of R.C. 2923.13; three counts of carrying a concealed weapon, in violation of R.C. 2923.12; one count of possession of marijuana, with a gun specification, in violation of R.C. 2925.11(A); and one count of illegal use or possession of drug paraphernalia, in violation of R.C.2925.14(C)(1). At his arraignment, Defendant pled not guilty. A jury trial was held and Defendant was found guilty of all pending charges except receiving stolen property. Defendant was sentenced accordingly and a timely appeal was filed.
 {¶ 3} Thereafter, on July 9, 2003, Defendant filed a motion for a new trial. This Court then remanded the matter back to the trial court for consideration of Defendant's motion. The trial court, after taking the matter under advisement, denied the motion. Defendant then filed an amended notice of appeal. Three assignments of error have been presented for review.
 ASSIGNMENT OF ERROR I
"[Defendant's] convictions were based upon insufficient evidence as a matter of law, and were against the manifest weight of the evidence."
 {¶ 4} In his first assignment of error, Defendant maintains that his convictions were against the manifest weight of the evidence. Defendant's contentions lack merit
 {¶ 5} As a preliminary matter, we note that sufficiency of the evidence produced by the State and weight of the evidence adduced at trial are legally distinct issues. State v. Thompkins (1997),78 Ohio St.3d 380, 386. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000) 9th Dist. No. 19600, at 3, citing Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring).
 {¶ 6} When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 7} In the present matter, Defendant was convicted of felony murder with the predicate offense of felonious assault, attempted murder, felonious assault, carrying a concealed weapon, improper discharge, having a weapon while under disability, drug trafficking, possession of a controlled substance, and possession of drug paraphernalia.
 {¶ 8} Felony murder is defined as "caus[ing] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" R.C. 2903.02(B)(2). Felonious assault, a felony of the second degree, consists of knowingly causing, or attempting to cause physical harm to another by means of a deadly weapon. A firearm is a deadly weapon. R.C. 2923.11(B)(1) and 2903.11(E)(1). See, also, R.C. 2903.11(D).
 {¶ 9} A conviction for attempted murder requires proof that the accused acted purposely or knowingly and that his conduct, if successful, would have resulted in the death of another. R.C. 2903.02(A) and 2923.02. One "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). A person will be found to have acted purposely "when it is his specific intention to cause a certain result[.]" R.C. 2901.22(A).
 {¶ 10} Defendant received several convictions relating to the improper handling of a firearm. In order to be convicted of improper discharge, one must knowingly, and without privilege to do so, "[d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of an individual." R.C. 2923.161(A)(1). Carrying a concealed weapon entails knowingly carrying or having a deadly weapon concealed on one's person or concealed ready at hand R.C.2923.12(A). Additionally, one may not knowingly acquire, have, carry, or use a firearm if he is under indictment for or has been convicted of any felony offense of violence or any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse, unless relieved from such disability pursuant to R.C.2923.14. R.C. 2923.13(A).
 {¶ 11} Additionally, Defendant was found guilty of various drug related charges. For Defendant to be convicted of trafficking in drugs, the State was required to prove that Defendant knowingly prepared for shipment or prepared for distribution a controlled substance with the knowledge, or reason to believe, that the substance was intended for sale or resale by the offender or another person. R.C. 2925.03(A)(2). In order for Defendant to be convicted of the possession of drugs and drug paraphernalia, it must have been shown that Defendant knowingly obtained, possessed, or used a controlled substance and knowingly possessed, with the purpose to use, drug paraphernalia. R.C. 2925.11(A); R.C.2925.14(C)(1).
 {¶ 12} Several witnesses testified on behalf of the State, including John Russell Ellis ("Ellis") and Michael Marshall ("Marshall"), friends of Corey Harper ("Harper") the victim. Ellis stated that he was with Harper at the car wash, on 1428 Copley Road, October 5, 2002, the night that Harper was murdered. Ellis maintained that Harper stopped at the car wash to vacuum his car before they went to the Main Attraction night club; Ellis indicated that Harper had wanted to purchase drinks for his friends that evening. The Main Attraction is adjacent to 1428 Copley Road. Ellis explained that he, Harper, and Marshall remained in the car for a few minutes listening to music and talking. He recalled that an individual then approached the car and began conversing with Marshall. Ellis was unable to hear the conversation due to the loud music and his position in the back seat of the vehicle. However, he remembered that they were laughing and did see the individual walk away.
 {¶ 13} Thereafter, Ellis and Harped exited the car to begin vacuuming. Harper had his cash in hand as he was going to pay to start the vacuum. Ellis testified that at this point, he dropped a quarter and bent down to retrieve it. As he was picking up the quarter, a man appeared with a gun "out of nowhere." He was wearing dark clothing, a "hoody" and was dark-skinned. The individual quickly approached with the gun pointed at Ellis. Ellis jumped and threw his arms in the air. His head struck the gun and it discharged. In fear, Ellis ran towards the back of the car wash. As he was running, he heard several shots being fired and saw a spark hit the wall in front of him. Ellis thought that he was going to be shot. He recalled that it sounded like two different individuals were shooting.
 {¶ 14} Ellis was able to climb the fence towards the rear of the car wash and hid behind a dumpster until the police arrived. When Ellis emerged from hiding, he saw roughly fifty to sixty people near the Main Attraction watching from the other side of the fence. No one was in the immediate vicinity of the car wash. Ellis recalled seeing Harper lying on the ground, alone, near his vehicle.
 {¶ 15} Marshall offered a similar version of the evening's events. Marshall explained that after purchasing marijuana, the three drove to the car wash to smoke "blunts" and vacuum the car before heading to the Main Attraction. Harper wanted the car to be clean in case they invited females into the vehicle to smoke with them. When they pulled into the car wash, Marshall recalled seeing a burgundy car and a lighter colored car in the parking lot. Additionally, he observed two black males, wearing dark clothing, standing by a fence near the pay phone. One was looking directly at him and made eye contact. Marshall assumed that the men knew Ellis or Harper.
 {¶ 16} Marshall stated that he, Ellis, and Harper then exited the vehicle. Marshall went to the rear passenger side of the car and began cleaning out the back seat. He then saw the two black men quickly approaching the vehicle with guns. One went toward the back of the car and the other, who remained in his sight, went towards Ellis. Marshall heard one shot fired and then dove onto the floor of the backseat. He remained on his back and had a limited view of the vacuum station. Marshall then felt the vehicle moving as if there were tussling or wrestling near the trunk area. After the movement stopped, one of the men closed the passenger side door to the vehicle and left. Marshall remained on the floor until he felt someone tugging at his leg. The individual was a friend of Marshall's who then helped him exit the car. Once outside, Marshall saw that Harper had been shot and he "lost it." He ran to Harper's side, kneeled down beside him and held Harper's head in his lap. Eventually Ellis also came to Harper's aid. The two then called Harper's mother and 9-1-1 and were taken to the police station.
 {¶ 17} At the station, Marshall was asked to view several photographs of possible suspects. Marshall identified the photograph of Defendant as the darker-skinned, shorter individual he saw at the car wash. However, he did not sign the back of the picture. Additionally, Marshall testified that one of the firearms the State produced at trial looked like the one the darker-skinned individual was holding the night of the murder. Marshall stated that he only saw the darker-skinned male discharge the firearm; he never saw the lighter-skinned individual shoot.
 {¶ 18} Hasan Wahid ("Wahid") testified that he was familiar with Defendant and Co-Defendant, Marcel McDaniel ("McDaniel"), from the neighborhood. He also knew Harper from his childhood. Wahid stated that on the night of the murder, he was sitting in his 2000 silver Taurus by himself at the car wash. The vehicle had temporary tags. When he pulled in, Harper, Ellis, and Marshall were already there, smoking "blunts." Wahid went to speak to a female friend, who was seated in a nearby car, and then walked over to Harper's vehicle. He talked to Harper for five minutes and then returned to his car and began listening to his music "loud to the extreme." Wahid observed Defendant near the pay phone in the car wash parking lot at this time.
 {¶ 19} A short while later, Wahid observed people scattering at the Main Attraction. He turned his radio down and heard the last couple of shots fired. Seconds later, Defendant and McDaniel "speed walk[ed]" over to Wahid's car and knocked on the window. He noticed that Defendant was wearing a black or blue "hoody" and there was a bulge in the pocket. Wahid let them in because Defendant said it was "hot," which he understood as meaning that "something wild [was] going on." When Defendant entered the vehicle, Wahid smelled a burning smell, "like steam in a factory." Defendant began asking "who got the weed, where is the weed[?]" Wahid explained that he found this unusual as there was "a drought on weed." He then asked Defendant and McDaniel what had happened and they said they did not know. However, Defendant kept asking about the drugs.
 {¶ 20} Wahid then testified that "his focus was [on] getting them back home or getting them back in the neighborhood" so he really did not pay much more attention to them. However, he maintained that he was not trying to protect the two men. He eventually dropped Defendant and McDaniel off at the Baughman and Wildwood area and then left. Wahid did not know where they went after that.
 {¶ 21} Wahid revealed to the police that the two individuals with him on the night of the murder were named "Beefy" and "C-Lo." He explained that Defendant's nickname was "Beefy" or "Ground Beefy." McDaniel was known as "C-Lo." Wahid positively identified Defendant in a photo array, and in the courtroom, as the individual who entered his car on October 5, 2002. Additionally, Wahid admitted that he has been convicted of possession of drugs, receiving stolen property and tampering with evidence in the past.
 {¶ 22} Ashara Elliot ("Elliot"), was in the area of Baughman and Wildwood on the evening of October 5, 2002. As she was walking home with her sister, she saw a car pull up and two men exit. She recognized one of the men as Defendant. Elliot heard him tell the other male, "[d]on't worry about it, it's going to be all right." She told Defendant that his girlfriend was looking for him and he responded that he had lost his cell phone. Elliot then asked Defendant for some money and he gave her $2.00. He kissed her on the head, and told her to go home and "be safe."
 {¶ 23} Larry Sutton ("Sutton") was frequenting the Main Attraction that same evening. He heard the gun shots from the car wash, but was unable to see who the shooters were. However, Sutton did observe a man shake hands with Harper and then hug him. He also observed two men run towards a silver Taurus and jump in. The vehicle then pulled out and headed east on Copley. Sutton was not sure if the man he saw speaking with Harper was one of the shooters.
 {¶ 24} Sutton testified that he then ran towards the car wash and saw Harper lying on the ground. He opened the front door of Harper's car and saw Marshall lying on floor. Sutton called Marshall's name but he did not respond. Sutton then tugged on Marshall's leg and he jumped out from the back seat of car. Sutton recalled that Marshall did not have a weapon.
 {¶ 25} Elmer Mahone and Dennis Mitchell were also in the area that evening. Both men testified that they saw two males run towards a gray car after the shooting. Each recalled that the car had temporary tags.
 {¶ 26} Officer Neven Webb, of the Akron Police Department, was the first to arrive at the scene. He and his partner, Officer Didyk, pulled into the car wash parking lot around 11:30 p.m. They observed Harper's vehicle in a carport with both the driver door and rear passenger door ajar. The stereo was still playing very loudly. Officer Webb estimated that there were one hundred individuals in the vicinity. As he approached the vehicle, he noticed Harper lying partially beneath the rear driver's side near the wheel and a large amount of blood smeared across the bumper. He recalled that there were no bodies in the vehicle. Officer Webb cleared the area and knelt to assess Harper. He was only able to detect a faint pulse. Officer Webb then secured the crime scene and screened for evidence. Several bullet casings were found. Detective David Hayes recovered a black cell phone from the scene and also took several photographs which he indicated portrayed bullet holes on a fence surrounding the rear of the car wash.
 {¶ 27} Officer Webb testified that while on the scene, a female approached him and indicated that a bullet had passed through her bedroom window. He responded to the house, on 914 Frederick, and investigated. A bullet was found on the floor beneath a marking on the wall where the bullet was deemed to have struck. Officer Webb stated that 914 Frederick was visible from the car wash bay where Harper's car was located. Deshana Davis testified that she resided at 914 Frederick on October 5, 2002.
 {¶ 28} Detective Michael Fox, of the Crime Scene Unit of the Akron Police Department, also responded to the crime scene on October 5, 2002. His primary duties include fingerprint identification and the processing of crime scenes. Detective Fox took several photographs and found numerous .380 and .45 shell casings and slugs. He indicated that the .45 casings were located predominantly near the rear of the vehicle. Detective Fox also lifted eight different hand and fingerprints from Harper's vehicle. The prints were later compared with a known print taken from Defendant by Detective Mildred Morris. Detective Fox opined that the hand print lifted from the front passenger door of Harper's vehicle was made by Defendant.
 {¶ 29} Detective John Bell testified that he received an anonymous tip that on November 13, 2002, Defendant was at the apartment complex of 159 Bachtel Avenue. That particular unit was rented by Tyson Davis who had been incarcerated since October of 2002.
 {¶ 30} Officer Robert Jackson, of the Akron Police Department, also was on duty November 13, 2002 and received a report regarding a wanted suspect, namely Defendant, who was in the Akron area. Officer Jackson responded to 159 Bachtel Avenue area in search of Defendant. He did not have an exact location of Defendant's whereabouts, however he observed a black Dodge Ram Charger, which was owned by Defendant's father, parked in the near vicinity. As Officer Jackson approached the apartment, he saw an individual look out the window and then walk away. Officer Jackson stated that he knocked several times. There was no response. He then ordered additional officers to "set the perimeter" around the house. Thereafter, Officer Jackson went to the second floor apartment and received consent from the female who opened the door to search. Officer Jackson testified that the female would not answer questions out loud but would write on paper. When Officer Jackson observed a chair beneath an upstairs attic opening, he asked the female if there was someone up there. She shook her head affirmatively and Officer Jackson radioed for the SWAT team. When the SWAT team arrived, Officer Jackson exited the apartment. He maintained that "[a]s [he] was walking down the driveway, that's when [Defenant] opened up the window on the west side of the house, put up his hands and said, `I'm coming out.'" Defendant was then placed under arrest.
 {¶ 31} Detective Richard Morrison seized several items from the 159 Bachtel Avenue apartment in which Defendant was arrested. Those items included a loaded 9 m.m. handgun, a 9 m.m. magazine, clothing, portable scale, sandwich baggies, syringes, and a large quantity of marijuana. Detective Reynolds testified that the way in which the marijuana was packaged into Ziploc sandwich baggies was a good indicator that it was being packaged for resale. He admitted, however, that there was no evidence that Defendant was the renter of that particular apartment unit. Detective Alan Jones, of the Street Narcotics Detail, agreed. He testified that 296.8 grams of marijuana was not the typical amount one would purchase solely for personal use. Detective Jones also stated that the evidence indicated that Defendant was preparing the drugs for resale.
 {¶ 32} Detective John Callahan was also present for the arrest of Defendant on November 13, 2002. Detective Callahan secured, for evidentiary purposes, Defendant's clothing, an additional cell phone, and black Timberland boots. Defendant had informed Detective Callahan that he did not live at 159 Bachtel and had been given a ride there. He maintained that he was visiting a female named "T" who had left shortly before the police arrived.
 {¶ 33} Fifteen year-old Kamilah Grant ("Grant"), Defendant's former girlfriend, also testified at trial. Grant stated that she had contact with Defendant in October of 2002 and recalled that his cell phone number in October of that same year was 459-4067. Grant maintained that she called Defendant on October 5, 2002 and had made plans to meet him sometime that evening. Grant indicated that she would meet Defendant at his cousin's, Tyson Davis, apartment at 159 Bacthel Avenue and had been there about five times. She testified that she never saw Defendant on October fifth. Grant recalled that approximately one week later, Defendant's cell phone number changed to 459-6136 after he had lost his previous phone. Additionally, Grant asserted that Defendant was known as "Beef" and his full nickname was "Beef Da Bully."
 {¶ 34} Scott Reynolds ("Reynolds"), an employee of Northcoast PCS, was asked to examine the cell phones recovered by Officer Webb and Detective Callahan. Reynolds stated that the phone found by Officer Webb, the evening of the murder, was a Nokia 5170. Reynolds determined that the phone number for the Nokia cell phone was 459-4067. The second phone recovered was an Audiovox 1110 with the phone number 459-6136. Reynolds testified that the Audiovox banner display read "Beef Da Bully" and one of the entries stored into the phones memory was titled "Keef" at 459-4067. Additionally, many of the names and numbers stored into the Nokia phone also appeared in the Audiovox phone. However, Reynolds indicated that the Audiovox phone was in the name of Lamont Davis. The Nokia phone was registered under Nick Mitchell and was purchased in Lodi, Ohio. Reynolds stated that Northcoast does not service the Lodi area. The phone records for the Nokia phone were subpoenaed. Reynolds explained that the records indicated that the phone was activated on January 5, 2002 and deactivated on October 24, 2002. Furthermore, on October 5, 2002, from 11:32 p.m. on, the phone was not answered.
 {¶ 35} Denise Rogers, the mother of Defendant's child, testified that Defendant used several cell phones. She indicated that she had many phone numbers for Defendant.
 {¶ 36} Dierra Williams ("Williams"), Defendant's former girlfriend, testified that she called Defendant's cell phone on the night of October 5, 2002. Williams further testified that Defendant's cell phone number was 459-4067. She explained that she called Defendant around 11:00 p.m. that evening and he answered. Defendant indicated that he was currently at the Main Attraction and would stop over at Williams' house in half an hour. Williams stated that when Defendant did not arrive by 11:45 p.m. she tried calling his cell phone again. This time, he did not answer. Sometime around 2:00 a.m. the following morning Defendant arrived at Williams' home. She recalled him apologizing and explaining that he had lost the phone. Defendant then asserted that when he was "at the Main and some crazy stuff happened and he had to get out of there." He told Williams that he saw some "dudes come up and start shooting at a car and it looked like [her] cousin's boyfriend." Williams stated that Harper was dating her cousin.
 {¶ 37} Additionally, Williams recalled that Defendant was wearing a black leather coat and Timberland boots when he arrived at her house. She further recalled seeing Elliot that same evening and telling her that she was looking for Defendant.
 {¶ 38} Martin Lewis ("Lewis"), a forensic scientist for the Bureau of Criminal Investigation ("BCI"), explained that he is responsible for conducting gunshot residue tests. Lewis indicated that gunshot residue is formed from the vaporous clouds that are expelled from openings in a firearm and settle on skin, clothing, and other items in the surrounding area. He stated that there are three ways that an individual may come to have reside traces on them: 1) by actually firing the weapon; 2) by being near the weapon when fired; and 3) by touching an item that is contaminated with the residue. Lewis maintained that the residue remains on items for an average of four to six hours, but if undisturbed it will settle until discovered.
 {¶ 39} Lewis was responsible for testing various samples obtained from Harper, Ellis and Marshall. Residue particles were detected on both the right and left hands of Harper and Marshall. Lewis asserted that there was more residue on Harper than on Marshall. There were no traces on Ellis.
 {¶ 40} Alfred Schwoeble ("Schwoeble"), who specializes in forensic gun shot residue analysis, testified that he was responsible for examining samples and clothing items obtained from Defendant. Residue was found on Defendant's belt and his right Timberland boot. Schwoeble noted, however, that there is no way to identify the precise moment when the particles were deposited onto an item.
 {¶ 41} On November 30, 2002, Kameron Jackson ("Kameron") was arrested. Officer John Strainer found a .380 caliber firearm in his possession. Kameron testified that he knew both Defendant and McDaniels and stated that he was at the car wash on October 5, 2002. Additionally, he stated that he has seen Defendant with a .45 in the past. Kameron maintained that he purchased the .380 from an individual named Fidel Watson.
 {¶ 42} Andrew Chappell ("Chappell"), of the BCI, asserted that he is responsible for examining firearms in order to discern if they are operable. Additonally, Chappell analyzes fired components in an attempt to discover the gun from which they were fired. Chappell determined that the .380 firearm, recovered when Kameron was arrested, was operable. Furthermore, his examination revealed that the .380 casings found at the scene were fired from this particular firearm.
 {¶ 43} Amy Schaffer ("Schaffer"), an investigator for the Summit County Medical Examiner's Office, responded to the Akron General Medical Hospital the night of the murder. Schaffer observed Harper and determined that he was deceased. She collected his personal belongings and spoke with various police officers about the evening's events. Schaffer stated that Harper had $1.07 in change on his person in addition to a wallet containing credit cards, a college identification card, and birth certificate.
 {¶ 44} Doctor George Sterbenz, the Summit County Medical Examiner, performed an autopsy on Harper. Dr. Sterbenz testified that Harper was shot in the chest area; there was a muzzle imprint left upon his chest. Therefore, Dr. Sterbenz determined that the muzzle of the gun was actually touching its target, Harper, and he therefore suffered a "contact-range" injury. He indicated that Harper was upright when shot and that the bullet passed through Harper's heart and completely exited the body. Dr. Sterbenz stated that Harper experienced severe internal bleeding and died from the gunshot wound to the chest in minutes.
 {¶ 45} Additionally, Officer Patrick Didyk testified to an unrelated incident involving Defendant. He stated that on September 15, 2002, he was on duty and stopped Defendant's vehicle. When the vehicle was stopped, an individual fled from the car. Officer Didyk indicated that a loaded firearm was recovered from the fleeing individual.
 {¶ 46} Keith Longhorn ("Longhorn") stated that he entered Defendant's vehicle on September 5, 2002, with his cousin Antoine Jackson ("Antoine"). Longhorn further stated that neither he nor his cousin possessed a firearm when entering the vehicle. Longhorn maintained that when Defendant was pulled over, Defendant pulled out a gun, and handed it to Antoine. Antoine then jumped out of the vehicle and began running.
 {¶ 47} Antoine testified that when he sat down in the front seat of Defendant's vehicle, on September 15, 2002, he noticed a firearm on the floor beside him. He indicated that the gun would not be visible to one looking into the car from the outside. Antoine recalled that when Defendant was stopped by the police, Defendant handed him the gun and told him to run. He complied with Defendant's request and was apprehended. Antoine admitted that he is currently scheduled for a probation violation hearing and indicated that if he testified truthfully, the State would recommend probation.
 {¶ 48} Officer William Price was responsible for apprehending Antoine on September 15, 2002. He testified that a firearm was recovered from Antoine's possession. Officer Price recalled that Defendant was wearing a bullet proof vest that afternoon but maintained that he did not know anything about the firearm that was recovered from Antoine's person.
 {¶ 49} Ernie Stallworth ("Stallworth"), of the Summit County Adult Probation Department, interviewed Defendant back in 1999 for a presentence investigation report for past violations. Stallworth recalled that Defendant was then being sentenced for two counts of carrying a concealed weapon, two counts of possession of cocaine, and three counts of trafficking in cocaine.
 {¶ 50} Although much of the evidence supporting Defendant's conviction is circumstantial, it is permissible for the elements of an offense to be established by direct evidence, circumstantial evidence, or both as circumstantial and direct evidence possess equal evidentiary value. State v. Jenks (1991), 61 Ohio St.3d 259, 272. The circumstantial evidence adduced at trial, if believed, reasonably supports the finding that Defendant was guilty of murder, attempted murder, felonious assault, carrying a concealed weapon, improper discharge of a firearm, possessing a weapon under disability, trafficking in drugs, possession of drugs, and possession of drug paraphernalia. Clearly, the jury, in weighing the evidence, the credibility of the witnesses and testimony elicited at trial, could have concluded that Defendant was guilty. Moreover, a determination as to what occurred is a question for the trier of fact, and it is not the function of the appellate court to substitute its judgment for that of the factfinder. See id. at 273. After careful review of the record, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when convicting Defendant of the numerous charges against him. Consequently, Defendant's convictions were not against the manifest weight of the evidence.
 {¶ 51} This Court has previously observed that "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." (Emphasis omitted.) State v. Roberts
(Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. As we have already determined that Defendant's convictions were not against the manifest weight of the evidence, we necessarily conclude that there was sufficient evidence to support the verdict in this case. Accordingly, Defendant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
"The trial court abused its discretion in denying [Defendant's] motion for a new trial."
 {¶ 52} In his second assignment of error, Defendant asserts that the trial court's denial of his motion for a new trial was an abuse of discretion. Specifically, Defendant argues that newly discovered evidence exonerates him of any involvement in the events leading to Harper's murder. Defendant's assertion lacks merit.
 {¶ 53} Pursuant to Crim.R. 33, a new trial may be granted "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." When the motion is based on newly discovered evidence, "`the defendant must produce * * * the affidavits of the witnesses by whom such evidence is expected to be given[.]'" State v. Starling, 10th Dist. No. 01AP-1344, 2002-Ohio-3683, at ¶ 12, quoting Crim.R. 33(A)(6). Affidavits must be presented to inform the trial court of the substance of the evidence that would be used if a new trial were to be granted.State v. Shepard (1983), 13 Ohio App.3d 117, 118.
 {¶ 54} A trial court's decision to grant or deny such a motion will not be reversed on appeal absent an abuse of discretion. State v.Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus. An abuse of discretion is more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd.
(1993), 66 Ohio St.3d 619, 621. Additionally, we note that a new trial is an extraordinary measure and should be granted only when the evidence presented weighs heavily in favor of the moving party. Otten,33 Ohio App.3d at 340.
 {¶ 55} There are several criteria that must be met before a trial court will grant an individual a new trial based on newly discovered evidence. State v. Petro (1947), 148 Ohio St. 505, syllabus. The defendant must demonstrate that the evidence 1) is of such weight that it creates a strong probability that a different result would be reached if a new trial is granted; 2) was discovered after trial; 3) could not, in the exercise of due diligence, have been discovered before trial; 4) is material to the issues; 5) is not merely cumulative to the former evidence; and 6) does not merely impeach or contradict the former evidence. Id.
 {¶ 56} In the present matter, we find that the newly discovered evidence, which is in the form of a letter to Defendant's attorney, does not satisfy the necessary requirements to warrant the granting of a new trial. First, the evidence is not presented by way of affidavit of the witness, McDaniel, by whom such evidence is expected to be given. See Crim.R. 33(A)(6). Furthermore, it is not clear that the evidence presented through McDaniel's letter would have changed the result of a new trial as it directly contradicts the physical evidence presented at trial. See State v. Young (July 12, 1996), 2nd Dist. No. 1391. Dr. Sterbenz testified that Harper died from a "contact-range" gunshot to the chest. Moreover, he noted that the muzzle of gun was directly touching its target, Harper, and that a muzzle imprint was left on his chest. The evidence that would be presented through McDaniel merely impeaches and contradicts the evidence that was presented in the case; McDaniel, through his letter, maintains that the shooting was accidental. McDaniel indicates that he and Harper struggled for the gun and it accidentally was discharged.
 {¶ 57} For the foregoing reasons, it is apparent that the trial court did not abuse its discretion by denying Defendant's motion for a new trial. Defendant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III
"The trial court erred in imposing maximum sentences on all counts and in imposing consecutive terms on multiple counts without making required statutory findings and stating its reasons for so doing at the sentencing hearing."
 {¶ 58} In his third assignment of error, Defendant asserts that the court erred when imposing maximum and consecutive sentences without making the required statutory findings or stating its reasons for doing so. We agree in part.
 {¶ 59} An appellate court may remand a matter to the trial court for resentencing if it finds that the trial court clearly and convincingly acted contrary to law. R.C. 2953.08(G)(2)(b). Clear and convincing evidence is that "`which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" State v. Eppinger (2001), 91 Ohio St.3d 158, 164, quotingCross v. Ledford (1954), 161 Ohio St. 469, 477.
 {¶ 60} The overriding purpose of felony sentencing is to punish the offender and to protect the public from future criminal acts. R.C.2929.11(A). R.C. 2929.12 provides that the trial court shall consider certain factors relating to the seriousness of the offender's conduct and others relating to the likelihood of the offender's recidivism. The Ohio Supreme Court has held that R.C. 2929.12 does not require specific language or specific findings on the record in order to show that the trial court considered the applicable seriousness and recidivism factors. State v. Arnett (2000), 88 Ohio St.3d 208, 215. See State v.Neptune, 9th Dist. No. 3171-M, 2001-Ohio-1768, at 4.
 {¶ 61} A trial court may impose the maximum prison term upon an offender if he falls into one of four categories: (1) those offenders committing the worst forms of the offense; (2) those posing the greatest likelihood of committing future crimes; (3) certain major drug offenders as provided in R.C. 2929.14(D)(3); and (4) certain repeat violent offenders as provided in R.C. 2929.14(D)(2). R.C. 2929.14(C). When imposing a maximum sentence, "the trial court must make a finding with respect to one of the four categories and specify its reasons for imposing the maximum sentence." State v. Newman, 9th Dist. No. 20981, 2002-Ohio-4250, at ¶ 8, citing R.C. 2929.19(B)(2)(d). See, also,State v. Edmonson (1999), 86 Ohio St.3d 324, 329. Recently, the Supreme Court of Ohio has held that these findings and reasons must be given orally by the court at the sentencing hearing before a maximum sentence may be imposed. See State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, at ¶ 26 (finding that "the rationale supporting [the] holding that findings and reasons must be given by the court before imposing consecutive sentences at the sentencing hearing applies with equal force to the length of sentences").
 {¶ 62} Additionally, Defendant argues that the trial court erred when it sentenced him to serve consecutive sentences. Specifically, Defendant argues that the trial court did not expressly state the required statutory factors for the imposition of consecutive sentences, pursuant to R.C. 2929.14(E)(4), nor give its reasons on the record for imposing the consecutive terms. We agree in part.
 {¶ 63} R.C. 2929.14(E)(4) provides for consecutive sentences if
"the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following: (a) [t]he offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction * * *, or was under post-release control for a prior offense[;] (b) * * * [t]he harm caused by two or more of the multiple offenses * * * was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct[;] (c) [t]he offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 64} Additionally, R.C. 2929.19(B)(2)(c) requires the trial court to state its reasons for imposing consecutive sentences under R.C. 2929.14. If a trial court fails to make the required findings, the appellate court "shall remand the case to the sentencing court and instruct the sentencing court to state, on the record, the required findings." R.C.2953.08(G)(1). These findings and reasons must also be given orally by the court at the sentencing hearing before a consecutive sentence may be imposed. Comer at ¶ 26.
 {¶ 65} In this case, Defendant appeals the imposition of maximum and consecutive sentences for his various convictions. When imposing the maximum sentences, the trial court stated that Defendant committed the worst forms of the offenses and posed the greatest likelihood of committing future crimes for each count that he was found guilty. The court indicated that it based its decision upon the particular way in which Defendant murdered Harper, by putting the muzzle right to Harper's heart, and also upon Defendant's extensive criminal record which consisted of numerous gun-related and drug convictions. Thus, we find that the court complied with the statutory requirements when imposing the maximum sentences upon Defendant. See Comer at ¶ 26.
 {¶ 66} However, when imposing consecutive sentences, the court only stated that it believed consecutive terms to be necessary in order to protect the public. It did not determine whether consecutive sentences would be disproportionate to the seriousness of Defendant's conduct and the danger the he posed to the public. Moreover, we note that the State has conceded that the necessary statutory findings, pursuant to R.C.2929.14(E)(4), were not complied with. Thus, the portion of Defendant's third assignment of error, which deals with the imposition of consecutive sentences, is sustained.
 {¶ 67} Defendant's first and second assignments of error are overruled. The third assignment of error is sustained in part. The judgment of the Summit County Court of Common Pleas is remanded to the trial court with instructions to resentence Defendant in accordance with the mandates of R.C. 2929.14(E)(4) and Comer.
Judgment affirmed in part, reversed in part, and cause remanded.
Carr, J. and Batchelder, J., concur.