DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, Darrell L. Pruiett, appeals from the decision of the Summit County Court of Common Pleas which found him guilty of two counts of violating a protection order and one count of domestic violence and sentencing him accordingly. We affirm.
 {¶ 2} On August 13, 2003, the Summit County Grand Jury indicted Defendant with one count of menacing by stalking, in violation of R.C. 2903.211(A), two counts of violating a protection order, in violation of R.C. 2919.27, and two counts of domestic violence, in violation of R.C. 2919.25(A) and (C). Following a trial, the jury convicted Defendant of two counts of violating a protection order and one count of domestic violence, acquitting him of menacing by stalking and the second count of domestic violence. The trial court sentenced Defendant to ten months incarceration for each of the violating a protection order convictions, and 30 days for the domestic violence conviction, all terms to be served concurrently. Defendant timely appealed raising three assignments of error for our review.
 ASSIGNMENT OF ERROR I
"The trial court committed reversible error when it denied [Defendant's] motion for a mistrial in the face of testimony indicating that [Defendant] had a prior criminal record, which was inadmissible under [Evid.R.] 404."
 {¶ 3} In his first assignment of error, Defendant alleges that the trial court erred by denying his motion for mistrial. Specifically, Defendant contends that the multiple inadmissible references during trial to his prior criminal record contributed to his convictions such that a mistrial should have been declared. We disagree.
 {¶ 4} When entertaining a motion for mistrial, the trial court must determine whether the substantial rights of the accused have been adversely affected. State v. Damberger (Aug. 30, 2000), 9th Dist. No. 3024-M, at 4, citing State v. Nichols
(1993), 85 Ohio App.3d 65, 69. Grant of a mistrial is necessary only when a fair trial is no longer possible. State v. Franklin
(1991), 62 Ohio St.3d 118, 127. Great deference is afforded to a trial court's decision regarding a motion for mistrial and the court's ruling will be reversed only upon the showing of an abuse of discretion. State v. Glover (1988), 35 Ohio St.3d 18, 19;State v. Stewart (1996), 111 Ohio App.3d 525, 533. An abuse of discretion is more than a mere error of law or judgment and implies that the court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd., 66 Ohio St.3d 619, 621,1993-Ohio-122.
 {¶ 5} Defendant based his motion for mistrial on "repeated references" made at trial indicating that Defendant had previously been incarcerated. After reviewing the record, this Court finds three references to Defendant's prior incarceration:
"Q. How long have you known [Defendant]?
"A. Maybe a little over a year. I met him through a mutual friend, this older guy, he had his legs amputated. I used to go over there and take care of him. And when [Defendant] came home from prison, [Defendant] went to his house."
* * *
"Q. Now, I believe you were at a Laundromat. Can you tell the jury a little bit about that day?
"A. Well that — I am at the Laundromat by my house. That's the day [Defendant] got out of jail."
* * *
"Q. Did you have further conversation [with Defendant] after that?
"A. Yes. He said — he let me know that he is not going back to jail — he wanted me to know this specifically, that he is not going back to the penitentiary, you know, to death do us part."
 {¶ 6} The judge sustained an objection to the first reference, and instructed the jury to disregard the testimony. A jury is presumed to have followed a court's instruction to disregard an answer which has been stricken from the record. SeeBrowning v. State (1929), 120 Ohio St. 62, 72; State v. Hunt,
9th Dist. No. 21515, 2003-Ohio-6120, at ¶ 21. Defendant has offered no evidence supporting that the jury disregarded that instruction. The trial court also sustained an objection to the second reference, without any limiting instruction. However, the judge overruled an objection to the third reference. Based on the curative instruction regarding the first reference, the admissibility of the third reference, and the additional evidence which supports a finding of guilt on each of the three convictions, we cannot find that the trial court abused its discretion in denying Defendant's motion for a mistrial. SeeHunt at ¶ 21; State v. Tillman (1997), 119 Ohio App.3d 449,461. Accordingly, we overrule Defendant's first assignment of error.
 ASSIGNMENT OF ERROR II
"[Defendant's] convictions are against the manifest weight of the evidence."
 {¶ 7} In his second assignment of error, Defendant argues that his convictions are against the manifest weight of the evidence. Specifically, Defendant states that "the State's star witness was a woman who takes four different antipsychotic medications every day to deal with manic depression and `oppressive' disorder that prevent her from holding gainful employment" which renders her testimony incredible. Defendant also indicates that "the State could not accurately establish when the alleged offenses occurred — and that some of them were physically impossible." We find Defendant's assertions meritless.
 {¶ 8} When a defendant maintains that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This court may only invoke the power to reverse based on manifest weight in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id.
 {¶ 9} Defendant was convicted of two counts of violating a protection order and one count of domestic violence. R.C.2919.27(A)(1) prohibits one from recklessly violating the terms of a protection order. One is reckless when "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." 2901.22(C). R.C.2919.25(C) prohibits one from knowingly using the threat of force to "cause a family or household member to believe that the offender will cause imminent physical harm" to that individual. An offender acts knowingly when he is aware that his conduct will probably cause a certain result or be of a certain nature. R.C.2901.22(B).
 {¶ 10} Lisa Gills Pruiett ("Gills") and Defendant were married May 16, 2003. While Gills found Defendant to be a hard working individual, she testified that she soon discovered that he was highly controlling, obsessive, and possessive. After their marriage, Gills indicated that Defendant would follow her everywhere, and accuse her of having sex with everyone. She also spoke about a multitude of telephone calls and messages which she received from Defendant between June and August of 2003, many of which were threatening.
 {¶ 11} The incident for which the jury convicted Defendant of domestic violence occurred on June 12, 2003. Gills testified that she was at her friend Pat Christian's ("Christian") house that afternoon after visiting her mother in the hospital. While she and Christian talked on the porch, Defendant arrived and made some crude remarks. The women asked him to leave. He originally refused, and sat on the porch listening to their conversation, but eventually left. The women then went into the house to continue their conversation.
 {¶ 12} While in the house, Gill's grandson, Royal, told her that he saw Defendant return. Gills looked out the window to see Defendant driving up and down the street, and eventually park in front of Christian's house while yelling crude comments out of his car window. After a while Defendant again left. Gills went out on the porch to call her son Dion to ask him to pick up her and Royal.
 {¶ 13} While she was talking on the phone, Defendant returned to the house, exited his vehicle, and came up very close to Gills on the porch demanding to know who she was speaking to. When she would not tell him, he grabbed her arm violently, leaving a bruise, while threatening her. At that point in time, Gills was afraid that Defendant would truly hurt her. She immediately told Defendant that she was talking to her son, Dion, and Defendant calmed down and left.
 {¶ 14} Gills then drove to the apartment where she and Defendant resided where she met her sons. Defendant was already at the apartment removing some of his belongings from the apartment and placing them into his van. Gills picked up a few things at the apartment, and then left, accompanied by her grandson Royal, to stay with her sons. Her sons followed her in a separate vehicle. As she drove, Royal looked out the back window and told her that Defendant was following them. Gills called her sons on her cell phone to tell them that Defendant was tailing her, and sped up to catch up to their vehicle which had passed hers at some point in time. Her sons stopped their vehicle in order to talk to Defendant, and Gills continued driving.
 {¶ 15} After stopping briefly to talk to Gills' sons, Defendant sped up and began following her again. Gills sped and ran a number of red lights and stop signs in an attempt to lose Defendant, but he simply followed her. She was finally forced to stop at a busy intersection, and Defendant approached her car. He tried to pull open the door while threatening to kill her. She then accelerated her vehicle away from Defendant. He followed again, speeding up and passing her in such a way that she almost crashed. She turned her vehicle around, only to find that Defendant was still following her. She finally turned unwittingly onto a dead end street, where she pulled into the driveway of the only house with its lights on. She stopped in the driveway and "laid on the horn."
 {¶ 16} Yasuko Barber recalled hearing the horn of Gill's car. Her husband went out to investigate, and eventually called the police.[1] Officer Joseph Bodnar and his partner responded to the scene. Officer Bodnar testified that:
"[Gills] was kind of hysterical, kind of crying[.] * * * She [told] us that she was being followed by [Defendant], who is threatening to kill her. She also stated to us that, you know, he grabbed her, kind of roughed her up a little bit earlier in the night, and she was driving throughout the town while he was following her. And she seemed pretty scared at the time[.]"
Officer Bodnar noted some swelling and light bruising on Gills' arms. He eventually accompanied Gills to the police station where pictures were taken of her arms and a report was filed.
 {¶ 17} The next day, Gill's mother was released from the hospital. Gills drove her mother's car over to her residence. When she arrived, she found that Defendant, who also lived at the same complex, was in the parking lot in his van. A woman Gills did not know was in the passenger seat. Defendant started yelling at Gills, who approached the open driver's side window. Gills testified that Defendant suddenly reached out of the window, grabbed her by the collar, and pulled her toward him as he began backing up the van. Defendant did not release Gills until she reached through the open window, scratched his face, and spat on him. The testimony of Gills' mother mostly corroborated Gills' testimony, though her mother did not remember seeing Gills reach through and scratch Defendant's face.
 {¶ 18} Following these incidents with Defendant, a temporary protection order (TPO) was entered on June 16, 2003, restraining Defendant from having any contact, phone, personal, or otherwise, with Gills. Gills testified that she called Defendant around July 6, 2003, and asked him to come to a Laundromat where they could talk. Defendant agreed, and met Gills at the Laundromat that day regardless of the existence of the TPO. Officer Roger Myers explained that a TPO only restrained contact by Defendant with Gills, and not vice versa. However, he indicated that Defendant's meeting with Gills at the Laundromat was a violation of the TPO then in place, regardless of whether Gills requested Defendant's presence or not.
 {¶ 19} Gills also testified about an incident which occurred at her friend, Pat Stephenson's ("Stephenson"), around July 19, 2003. That evening Defendant arrived at the home around dusk and confronted Gills about a court appearance. Gills asked Defendant multiple times to leave, which he briefly did. However, Defendant soon returned to the home, and continued to try to speak with Gills. She, again, repeatedly asked him to leave. As Defendant became more animated in his attempts to talk with Gills, one of Stephenson's daughters called Gills into the kitchen, where she tried to arm Gills with a knife and a baseball bat to protect her. About that time, Stephenson, who had driven with another woman to pick up beer and cigarettes, arrived back at her house. While Stephenson was talking to Defendant, Gills or one of Stephenson's daughters called the police.
 {¶ 20} At about 12:30 a.m., only minutes after hearing a report of a fight with weapons at Stephenson's, Officer Jeffrey Kubasek and his partner responded to the scene. Officer Kubasek observed a large, dark, four-door sedan, driven by a black male, pulling out of the driveway. Because he wanted everyone who was at the home available for questioning in the investigation, he turned on the overhead lights on his cruiser and put the spot light on the dark sedan. The sedan, however, did not stop. Instead, it drove quickly past the cruiser.
 {¶ 21} Officer Kubasek and his partner followed the sedan, trying to catch up to it, but eventually had to stop their pursuit. The officer explained that not only was the sedan running stop signs, but it was also traveling at a speed in excess of 60 or 70 m.p.h. through residential streets. When the officers determined that the threat to public was too great to continue the pursuit, they returned to Stephenson's home. While at the home, Officer Kubasek first ran the license plates on the vehicle, which matched those of Defendant's car, and then verified with Gills that Defendant had, in fact, left just as he and his partner arrived.
 {¶ 22} Officer Nevin Webb also responded to the scene around 12:30 a.m. He recalled that Gills "was running back and forth kind of in and out of the house * * * [and was] very upset, very anxious, very emotional." Both Gills and Stephenson told Officer Webb that Defendant had arrived unwelcome at the home and was trying to instigate a confrontation with Gills. Officer Webb verified that a TPO was currently in place against Defendant, and then had Gills accompany him to the station to sign a complaint and make a statement.
 {¶ 23} Defense counsel attacked the State's testimony through use of inconsistencies within each witness's testimony. Specifically as to Gills, she admitted on cross examination that she was unemployed, and receiving SSI for a mental disability which she had struggled with for nearly fifteen years. When she was 18, she was hospitalized for psychological problems after having a mental breakdown. She was also hospitalized a second time, though nearly eighteen years had lapsed since that episode. Gills also recalled a period of time nearly ten years previously when she could not drive because she had too many panic attacks. While she admitted to still having the occasional panic attack, she also indicated that she could control them much more than before. At the time of each of the incidents in question, Gills was taking four different prescriptions for her mental disability, though she denied that they affected her perception or ability to drive a vehicle. She also admitted that she had used both marijuana and cocaine in the past, but denied any recent use. In order to impeach Gill's testimony, defense counsel also placed emphasis on the fact that Gills could not recall the specific time and date of each incident, though the State offered evidence tending to show that Defendant made so many threats to Gills that it would be difficult for her to remember them all.
 {¶ 24} After reviewing the evidence offered at trial, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. Evidence in the record supports that Defendant intended to have personal contact with Gills on at least two occasions after the TPO was entered: once by meeting her at the Laundromat and once by confronting Gills at Stephenson's house. The evidence also supports the domestic violence by menacing conviction: on June 12, 2003, Defendant followed Gills multiple miles though Akron until she was forced to stop in a stranger's driveway where Officer Bodnar responded, finding Gills hysterical and fearful of her life. Accordingly, we overrule Defendant's second assignment of error.
 ASSIGNMENT OF ERROR III
"The trial court erred when it failed to state on the record the reasons why it imposed upon [Defendant] a greater-then-minimum sentence."
 {¶ 25} In his final assignment of error, Defendant asserts that the trial court erred by failing to state its rationale for imposing a greater-than-minimum sentence on the record at the sentencing hearing. Specifically, Defendant avers that the court failed to follow the dictates of State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165. We disagree.
 {¶ 26} This court may remand a case for re-sentencing only if it clearly and convincingly finds that the trial court's findings are not supported by the record or that the sentence imposed is otherwise contrary to law. R.C. 2953.08(G). Clear and convincing evidence is that "`which will produce * * * a firm belief or conviction as to the allegations sought to be established.'"State v. Eppinger, 91 Ohio St.3d 158, 164, 2001-Ohio-247, quoting Cross v. Ledford (1954), 161 Ohio St. 469, 477. Trial courts are required to make certain findings orally on the record at the sentencing hearing. See Comer at ¶ 20, 26. For example, when a court imposes consecutive sentences, a maximum sentence, or a more-than-minimum sentence upon a first time offender, the court must make certain statutorily required findings at the sentencing hearing. Comer at ¶ 20, 26; State v. Gilcreast,
9th Dist. No. 21533, 2003-Ohio-7177, at ¶ 61. However, this particular case deals specifically with the imposition of a more-than-minimum sentence upon an offender who has served a prior prison term.
 {¶ 27} R.C. 2929.14(B) states:
"if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense * * * unless one or more of the following applies:
"(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
"(2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."
 {¶ 28} Comer held that R.C. 2929.14(B)(2), by using the phraseology "finds on the record[,]" requires the trial court to make those necessary findings orally at the sentencing hearing.Comer at ¶ 26. Similar phrasing in other statutory language also supports requiring other findings to be made orally at the sentencing hearing. See Comer at ¶ 20; Gilcreast at ¶ 61. However, this language, or any language relating to "a finding", "finds", or "on the record", is blatantly absent from R.C.2929.14(B)(1). Therefore, where a court imposes a more-than-minimum sentence upon an offender under R.C.2929.14(B)(1), the court is not required by the statute to make any specific finding on the record at the sentencing hearing. Accordingly, we overrule Defendant's third assignment of error.
 {¶ 29} We overrule Defendant's assignments of error and affirm the decision of the Summit County Court of Common Pleas.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Carr, P.J., Whitmore, J., concur.
[1] While Yasuko testified at trial, her husband, unfortunately, had recently passed away.