DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Edward J. Morton has appealed from his conviction of complicity to commit robbery and his subsequent sentence imposed by the Summit County Court of Common Pleas. This Court affirms.
 I {¶ 2} On May 12, 2004, Appellant was indicted on one count of complicity to commit aggravated robbery, in violation of R.C. 2911.01(A)(3) and R.C. 2923.03(A)(1), with a firearm specification pursuant to R.C.2941.145,[1] and one count of complicity to commit robbery, in violation of R.C. 2923.03 and R.C. 2911.02(A)(3). On May 18, 2004, Appellant pled not guilty to all charges.
 {¶ 3} A jury trial commenced on July 21, 2004. The following day, the jury found Appellant not guilty of complicity to commit aggravated robbery and guilty of complicity to commit robbery. Appellant was sentenced to four years incarceration.
 {¶ 4} Appellant has timely appealed his conviction and sentence, asserting four assignments of error. Appellant's first and second assignments of error have been consolidated for ease of analysis.
 II Assignment of Error Number One
"Appellant's conviction of complicity to commit robbery was contrary to the manifest weight of the evidence."
 Assignment of Error Number Two
"The trial court erred in failing to grant appellant's criminal rule 29 motion to dismiss the [complicity to commit robbery] charge following the conclusion of the state's case."
 {¶ 5} In his first and second assignments of error, Appellant has argued that there was insufficient evidence to convict him and that his conviction was against the manifest weight of the evidence. Specifically, Appellant has argued that the State did not prove all of the elements of complicity to commit robbery and that the evidence demonstrated that he played no role in the robbery. We disagree.
 {¶ 6} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v. Jenks
(1991), 61 Ohio St.3d 259, 279. Furthermore:
"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id, at paragraph two of the syllabus; see, also, Thompkins,78 Ohio St.3d at 386.
 {¶ 7} In State v. Roberts, this Court explained:
"[S]ufficiency is required to take a case to the jury. * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." State v.Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. (Emphasis omitted).
 {¶ 8} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
"[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten
(1986), 33 Ohio App.3d 339, 340.
 {¶ 9} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. at 388. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten, 33 Ohio App.3d at 340.
 {¶ 10} Appellant was convicted of complicity to commit robbery in violation of R.C. 2923.03 and R.C. 2911.02(A)(3), a felony of the third degree.
R.C. 2923.03 provides that:
"(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
"(1) Solicit or procure another to commit the offense;
"(2) Aid or abet another in committing the offense [.]"
 {¶ 11} Pursuant to R.C. 2911.02(A)(3), "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [u]se or threaten the immediate use of force against another."
 {¶ 12} During the trial, the State presented testimony from five witnesses. Tafik Mustapha ("Mustapha") testified first for the State. Mustapha testified to the following. On May 4, 2004, Mustapha was working as a clerk at the Dairy Mart located at 587 West Market Street in Akron, Ohio. Mustapha recognized Appellant as a customer of the Dairy Mart and remembered him coming in the store on May 4, 2004. Appellant came in the store and asked for two cigarettes. Appellant did not have enough money so Mustapha gave him one cigarette and Appellant was supposed to pay him back. Appellant then left the store.
 {¶ 13} Mustapha continued his testimony, testifying to the following. The Diary Mart had one security camera and it was recording on May 4, 2004. The videotape of that day truly and accurately depicted the events as they occurred on that date. The video showed Appellant entering the store for cigarettes and then a couple of minutes later a young man entered the store and robbed it at gun point.
 {¶ 14} The robber entered the store showing the gun to Mustapha and told him to open the register and give him the money. A "little struggle" ensued and then Mustapha went to the register to get the robber the money. Mustapha had difficulty opening the register and began to panic. Once Mustapha opened the register and started giving the robber the money, he looked at the robber and noticed he looked young. The robber then told Mustapha "Don't look at me, don't look at me." The robber then opened his bag and Mustapha put as much money in it as he could. The next thing Mustapha knew the robber was knocking him in the head and he fell to the floor.
 {¶ 15} On cross-examination, Mustapha testified to the following. Appellant was a regular customer. Mustapha had given him cigarettes on credit before and even allowed Appellant to reach across the counter to retrieve a lighter to light his cigarettes. There were about six customers in the store when the robber entered the store.
 {¶ 16} Officer Hill of the Akron Police Department ("APD") testified next for the State. Officer Hill testified to the following. Officer Hill was working on May 4, 2004 when he received the radio broadcast of an armed robbery at the Dairy Mart on Market Street and Rhodes Avenue. The broadcast also stated that the store clerk was injured and provided a description of the suspect's clothing. When Officer Hill learned the suspect left the Dairy Mart traveling north, he proceeded on Rhodes towards Merriman Road. Officer Hill received the broadcast at 10:51 a.m. and arrived in the area at 10:54 a.m.
 {¶ 17} Officer Hill observed two males walking south on Merriman Road towards Charlotte St. He first noticed them at the intersection of Rhodes and Merriman. At first Officer Hill was not suspicious of the two males, but then they both continually looked over their shoulders at Officer Hill. Officer Hill maintained observation of the two males as they walked down Charlotte.
 {¶ 18} Officer Hill continued testifying to the following, he and Officer Iverson, of the APD, exited their patrol cars near the intersection of Charlotte and Weber Avenue and approached the males. They informed the males that they wanted to talk to them. Another member of the APD, Officer Radca, joined Officers Hill and Iverson. Appellant was one of the two males. When asked where they were coming from Appellant and the other male ("Murphy") informed the officers that they were out for a walk. When asked again where they were coming from, they again stated that they were out for a walk. Appellant and Murphy were asked a third time and they again said they were out for walk without stating where they were coming from. At this point, Officer Iverson separated Murphy from Appellant and Officer Hill. Officer Iverson reported back to Officer Hill that Murphy's heart was "pounding profusely" and that he was sweating more than the weather conditions and his attire warranted. After conferring with APD detectives, Officer Hill transported Appellant to the detective bureau.
 {¶ 19} On cross-examination, Officer Hill testified to the following. Appellant informed him that he was coming from the barber shop, which was located across the street from the Dairy Mart.
 {¶ 20} Elizabeth Vargo ("Vargo") testified to the following for the State. She resides at 57 Charlotte Street in Akron, Ohio. On May 4, 2004, she was sitting on her couch sewing and noticed a purple car pull into her neighbor's driveway with two men in the front seat. The driver was a "kind of large[,]" African American gentleman with short hair. The passenger was also an African American male and he had "something on his head." Her neighbor's house was for rent and Vargo assumed the men were coming to look at the rental. Vargo then heard the car back out of the driveway and pull to the curb and then she "heard doors open and close, open and close, open and close." Vargo continued sewing and later noticed "two police cars [flying] down the street[.]" She then noticed that the car that was previously parked in her neighbor's driveway was parked directly outside her own house. The car was unoccupied and there was no one waiting outside her neighbor's house. To the best of Vargo's estimation, it was less than two minutes from the time she heard the car doors opening and closing until the police drove past her house.
 {¶ 21} Vargo continued her testimony, testifying to the following. She noticed several police officers and police dogs searching her neighborhood and exited her home and informed the officers that the car parked in front of her house was not her car. She then informed the officers about the car pulling into her neighbor's driveway and then backing out and parking and the doors opening and closing. When asked if she had ever seen Appellant before, at all, Vargo replied "No, I have never, that I know of, seen him."
 {¶ 22} Officer Myers of the APD testified to the following for the State. After receiving the radio broadcast about an armed robbery, Officer Myers responded to the scene and was the first to arrive at the Dairy Mart. While Officer Myers secured the Dairy Mart and attended to Mustapha, other patrol cars were patrolling the area for the suspects. Officer Myers learned that the suspect headed north out of the store and reported that to the officers patrolling for the suspect.
 {¶ 23} Detective Morrison ("Det. Morrison") of the APD testified to the following for the State. Det. Morrison arrived at the Dairy Mart and viewed the surveillance video. He then went to the area where Officer Hill was speaking to Appellant and Murphy. Det. Morrison instructed the officers to transport Appellant and Murphy to the detective bureau because their stories about where they had been and where they were going were inconsistent.
 {¶ 24} Det. Morrison continued his testimony, testifying to the following. He investigated the purple Cavalier that had been parked outside Vargo's home. The passenger rear window of the car was broken. From outside the vehicle he observed on the floor of the back seat of the vehicle an open book bag with money and a gun in it. Having previously viewed the surveillance tape, Det. Morrison knew a book bag was used in the robbery. He also saw the mask, sweat pants, and hoodie-sweatshirt from the video on the back seat. He also found a pair of Nike sneakers that matched the description of those worn by the robber. Det. Morrison secured the items and removed them from the car. The car containing the gun and clothes used in the robbery, as well as the money from the robbery belonged to Deleah Ford ("Ford"). Ford was Appellant's girlfriend.
 {¶ 25} Det. Morrison testified that he interviewed Appellant at the detective bureau and provided the following testimony concerning the interview. Appellant told Det. Morrison that he gave Murphy a ride and they parked on Charlotte because Appellant was going to visit "somebody down there." Appellant would not tell Det. Morrison who he was going to visit. Appellant told Det. Morrison that he exited the car and did visit the Dairy Mart. Appellant said he was going to walk across the street to the barber shop and he ran into Murphy on the way back. Appellant informed Det. Morrison that he was not on the video robbing the store and that he didn't do it. When asked why he was walking away from his girlfriend's car, Appellant told Det. Morrison that he did not have a driver's license and that there were too many police officers in the area and he did not want to get stopped without a license. Appellant denied knowing what Murphy did, but he provided conflicting stories because he also said he did not want to get Murphy in trouble. Appellant acknowledged the book bag was in the car, but denied having any knowledge of what it contained. Appellant reiterated to Det. Morrison that if the video didn't show him robbing the store, he didn't do it.
 {¶ 26} On cross-examination, Det. Morrison testified to the following. The gun, money and clothing were in plain view in the back seat of the vehicle. No fingerprint or DNA tests were conducted on the gun, money, clothes or book bag to connect them to Appellant. Appellant stated he had met Murphy on the evening of May 3, 2004. Appellant never wavered from his position that he had no involvement in the robbery.
 {¶ 27} On re-direct examination, Det. Morrison testified to the following. Appellant was driving Ford's vehicle on the day of the robbery. Det. Morrison had no doubt that Murphy was the person who robbed the Dairy Mart and that the gun, clothes and money found in Ford's car, which Appellant was driving, were the gun and clothes used in the robbery and the money stolen from the store.
 {¶ 28} After the conclusion of the State's witnesses, the following exhibits were admitted into evidence: the surveillance video; an incident report; three pictures of Ford's vehicle; the book bag; a pair of pants; a hat; a hoodie-sweatshirt; basketball shoes; a gun; a basketball cap; and a map. After the State rested its case, Appellant made a Crim.R. 29 motion. The trial court overruled Appellant's motion.
 {¶ 29} Without calling any witnesses or presenting any evidence, Appellant rested his case. Appellant then renewed his Crim.R. 29 motion and the trial court overruled the motion.
 {¶ 30} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the trial court clearly lost its way when it found Appellant guilty of complicity to commit robbery. The trial court was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony. SeeState v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The credible testimony of Mustapha, Officers Hill and Myers, Det. Morrison and Vargo, along with the State's exhibits, established that Appellant committed the crime as charged.
 {¶ 31} Based on the foregoing, this Court cannot find that Appellant's conviction was against the manifest weight of the evidence. Furthermore, as previously stated, "a determination that [a] conviction is supported by the weight of the evidence [is] also * * * dispositive of the issue of sufficiency." Roberts, supra at 4. Accordingly, having found that Appellant's conviction was not against the manifest weight of the evidence, this Court need not discuss further his challenge to the sufficiency of the evidence. Thus, we find that the trial court did not err in denying Appellant's motion for acquittal. Appellant's first and second assignments of error are not well taken.
 Assignment of Error Number Three
"Whether the trial court's sentence was contrary to law since it did not take into account fundamental sentencing principles, express sentencing criteria, or make findings pursuant to ohio revised code section 2929.14(B)[.]"
 {¶ 32} In his third assignment of error, Appellant has argued that the trial court erred in imposing more than the minimum sentence for his conviction. Specifically, Appellant has argued that "[n]owhere (sic) in the record are the required findings made" to impose more than the minimum sentence. We disagree.
 {¶ 33} When reviewing a sentence on appeal, an appellate court "may increase, reduce, or otherwise modify a sentence" or it may vacate the sentence and remand the matter for resentencing. R.C. 2953.08(G)(2). Pursuant to R.C. 2953.08(G)(2):
"The appellate court's standard of review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
"(a) That the record does not support the sentencing court's findings under division (B) or (D) of [R.C. 2929.13] * * *;
"(b) That the sentence is otherwise contrary to law." R.C 2953.08(G)(2).
Clear and convincing evidence is:
`"[T]hat measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."' State v. Eppinger (2001), 91 Ohio St.3d 158, 164, quoting Cross v. Ledford (1954), 161 Ohio St. 469, 477.
 {¶ 34} Appellant has asserted that the trial court erred when it did not state the proper findings when it sentenced him beyond the minimum prison sentence for his conviction. As previously noted, Appellant was convicted of complicity to commit robbery, in violation of R.C. 29293.03/2911.02(A)(3), which is a felony of the third degree.
 {¶ 35} Pursuant to R.C. 2929.14(A):
"[I]f the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender * * * and is not prohibited by [R.C. 2929.13(G)(1)] from imposing a prison term on the offender, the court shall impose a definite prison term that shall be one of the following:
"* * *
"(3) For a felony of the third degree, the prison term shall be one, two, three, four, or five years."
 {¶ 36} Pursuant to R.C. 2929.14(B):
"[I]f the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense * * * unless one or more of the following applies:
"(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term." R.C.2929.14(B)(1). (Emphasis added).
 {¶ 37} Pursuant to R.C. 2929.14(B)(1), if a defendant has previously served a prison term the trial court need not impose the shortest prison sentence or make findings for why it declined to do so. See State v.Pruiett, 9th Dist. No. 21796, 2004-Ohio-3256, at ¶ 28.
 {¶ 38} In the present case, the jury found Appellant guilty of complicity to commit robbery. A review of the sentencing transcript shows that Appellant had an extensive criminal history and served a term of incarceration. Specifically, the trial court stated the following to Appellant: "[F]or a young man of 23 years of age, in my opinion, [you] have a substantial record. You certainly have been to the penitentiary." Appellant admitted that he was incarcerated the previous year. The trial court found that Appellant committed a crime of violence and showed no remorse. The trial court informed Appellant that giving him the minimum sentence would demean the seriousness of the offense and not adequately protect the public. The trial court then sentenced Appellant to four years incarceration.
 {¶ 39} The sentencing journal entry also cited that Appellant had a substantial criminal record and had previously served time in prison. The trial court reiterated in the journal entry that the minimum sentence would not adequately protect the public and that the minimum sentence would demean the serious nature of the crime. The trial court also found that Appellant was not amenable to community control and that prison was consistent with R.C. 2929.11.
 {¶ 40} Having complied with the statutory requirements of R.C. 2929.14, this Court finds that Appellant has failed to demonstrate by clear and convincing evidence that the trial court acted contrary to law when it imposed a sentence that exceeded the minimum prison term. Appellant's third assignment of error is not well taken.
 Assignment of Error Number Four
"THE TRIAL COURT ERRED IN FAILING TO SUSTAIN THE APPELLANT'S BATSON CHALLENGE."
 {¶ 41} In his fourth assignment of error, Appellant has argued that the trial court erred in its application of Batson v. Kentucky (1986),476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Specifically, Appellant has argued that when he objected to the State's peremptory challenge of a person in his racial group, the State failed its burden under Batson and the trial court erred in overruling his objection. We disagree.
 {¶ 42} The Equal Protection Clause of the United States Constitution prohibits deliberate discrimination based on race by a prosecutor in his exercise of peremptory challenges. Batson, 476 U.S. at 89. A defendant has a right to be tried by a jury whose members are selected by nondiscriminatory criteria. Powers v. Ohio (1991), 499 U.S. 400, 404,111 S.Ct. 1364, 113 L.Ed.2d 411. This Court reviews whether a party exercised its peremptory challenges in a discriminatory manner under the clearly erroneous standard. Hernandez v. New York (1991), 500 U.S. 352,364-65, 111 S.Ct. 1859, 114 L.Ed.2d 395; see, also, Akron v. Burns, 9th Dist. No. 21338, 2003-Ohio-3785, at ¶ 15.
 {¶ 43} A three-part test is employed to determine whether a peremptory challenge is based on race. See State v. Jones, 9th Dist. No. 22231, 2005-Ohio-1275, at ¶ 27. First, the defendant must establish a prima facie case of discriminatory use of peremptory challenges by the prosecution. Batson, 476 U.S. at 96-97. To meet the first prong of the test, the defendant must show that all the facts and circumstances surrounding the prosecution's exercise of peremptory challenges, used to exclude members of a cognizable group, raised an inference that the prosecution exercised challenges based on the excluded jurors' race. Statev. Hill (1995), 73 Ohio St.3d 433, 444-45, certiorari denied (1996),516 U.S. 1079, 116 S.Ct. 788, 133 L.Ed.2d 738.
 {¶ 44} After the defendant makes his prima facie case, the burden shifts to the prosecution to provide a race-neutral explanation for the preemptory challenge. Id. at 445. The prosecution does not have to provide "an explanation that is persuasive, or even plausible." Purkett v. Elem
(1995), 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834. "[T]he issue is the facial validity of the prosecution's explanation. Unless a discriminatory intent is inherent in the prosecution's explanation, the reason offered will be deemed race-neutral." (Quotations and citation omitted). Id.
 {¶ 45} To meet its burden, the prosecution must give a clear and reasonably specific explanation of its legitimate reasons for exercising the challenge. Batson, 476 U.S. at 98, fn. 20. A "legitimate reason" need not make sense, but it must not deny equal protection. Purkett,514 U.S. at 769. The prosecution must provide an explanation "based on something other than the race of the juror." Hernandez, 500 U.S. at 360.
 {¶ 46} After the prosecution has presented its explanation, the trial court must determine whether, under all the relevant circumstances, the defendant has met his burden of proving purposeful racial discrimination. Batson, 476 U.S. at 96-97. The trial court must consider the persuasiveness and credibility of the justification offered by the prosecution. Hicks v. Westinghouse Materials Co. (1997), 78 Ohio St.3d 95,99, certiorari denied (1997), 78 Ohio St.3d 95, citing Purkett,514 U.S. at 768. It must determine whether the neutral explanation offered by the prosecution is credible or is instead a pretext for unconstitutional discrimination. Hernandez, 500 U.S. at 363. The trial court's finding turns largely on evaluations of credibility and is given great deference. Batson, 476 U.S. at 98, fn. 21. As previously stated, this Court will only reverse a trial court's finding of a racially-neutral reason if it is clearly erroneous. Hernandez,500 U.S. 364-65.
 {¶ 47} In the instant matter, the record demonstrates that during voir dire counsel for Appellant posed the following question to the jury panel:
"Sometimes we have philosophical or theological positions that we do not feel that perhaps we should sit in judgment of another human being. Is there anyone here, again, if we can see by raising hands, who would feel that because of their own deeply held values they would not be capable of sitting in judgment as a juror in this case?"
 {¶ 48} The potential juror at issue ("Juror") responded "Yes." The following colloquy occurred between counsel for Appellant and Juror,
"[Juror]: I struggled with this before I came, because I really don't feel that it is my place to judge an individual. I do know that each individual is presumed innocent before guilt or found guilty, so that is what I am struggling with. I don't want to be in the position if someone is found guilty but they are really innocent, I don't want to be the one to say this person was guilty. So I don't want to judge someone basically. * * * That's my struggle.
"[Counsel for Appellant]: I see that are you wearing a cross, and I certainly can respect your comments. Could you approach this in a way that you would look upon your role as being important in this process and that you could come to with fairness, impartiality, understanding?
"[Juror]: Yes, I could.
"[Counsel for Appellant]: Okay. So you are saying that you could participate here as a juror. I think what you say really shows a balance, and I believe those are the kind of people that we need on a jury. So you now believe that you could sit here in broad consideration of it and be a juror; is that correct?
"[Juror]: Yes, I could."
 {¶ 49} During the challenge portion of jury selection, the State exercised a peremptory challenge against Juror. Counsel for Appellant objected, arguing the following:
"Your Honor, I would object to that. I believe that she had answered all of the questions quite straightforwardly, that she indicated that she could sit as an impartial juror. I believe there are [Batson] issues. * * * I would object on the [Batson] objection."
The following colloquy occurred between the trial court and the State:
"[Trial court]: Okay. And now, for purposes of the record, [State], do you wish to place on the record your rationale for utilizing your peremptory challenges with respect to the [Juror]?
"[State]: Yes, Your Honor. My race neutral reason is that she indicated she did not want to sit in judgment of another man and that she was concerned that she would find someone guilty who was innocent, I think is the word she used. So based on that as a peremptory challenge, not a challenge for cause, I am asking that she be excused.
"[Trial court]: All right. The Court believes that there is sufficient non[-]racial reasoning. The Court minimally was confused with respect to her answer, but I was led to believe from her responses at your questioning that she had great difficulty in judging any person and was concerned about making a finding of guilty for somebody that might ultimately be innocent. And I think that that would certainly be sufficient reason. And the Court will, over the objection of the defendant, allow excuse for Juror at this time."
 {¶ 50} The trial court determined that the State's peremptory challenge of the Juror was race-neutral and rejected Appellant's claims that the reason was merely a pretext. Juror admitted that she had doubts that she could judge another person and that she was concerned about finding an innocent person guilty. Based on the record before this Court, we cannot find that the trail court's conclusion was clearly erroneous. Appellant's fourth assignment of error is not well taken.
 III {¶ 51} Appellant's four assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Slaby, P.J., Carr, J., concur.
[1] The State later dismissed the gun specification.